AUTOMOBILE ACCEPTANCE CORPORATION
*v.* UNIVERSAL C. I. T. CREDIT CORPO-
RATION

[No. 124, September Term, 1957.]

*Decided March 13, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*James A. Ostendorf,* with whom was *Arold H. Ripperger* on the brief, for appellant.

*Eli Baer,* with whom was *Malcolm J. Coan* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

An automobile dealer, Suburban Nash, Inc., on July 5, 1955, sold a used car to a customer, F. L. Thomas, under a contract of conditional sale which the customer duly executed, and Suburban Nash assigned the contract to the appellee, Universal C.I.T. Credit Corporation ("C.I.T."). On the next day, in some manner not disclosed by the evidence, Suburban Nash induced the customer to sign another contract of conditional sale, and Suburban Nash assigned the second contract to the appellant, Automobile Acceptance Corporation ("Auto Acceptance"). Neither contract was re-

corded until Suburban Nash was in serious financial diffi-
culties and either had gone out of business or was about to
do so. Auto Acceptance then recorded its contract on Febru-
ary 1, 1956, and C.I.T. did likewise three days later.

This suit was brought in the Circuit Court of Baltimore
City by C.I.T. for a declaratory judgment or decree to es-
tablish the superiority of its claim over that of Auto Accept-
ance and for appropriate relief, in accordance with such a
declaration, by injunction and by impressing a trust in favor
of C.I.T. upon funds received by Auto Acceptance under its
claim. Thomas, the customer, was joined as a party. He
filed no formal answer, but wrote a letter to the Clerk of
the Court denying "knowledge of the crooked deals that were
being pulled." His good faith was not challenged, no claim
against him is pressed by either of the other parties on this
appeal and the controversy both here and in the Circuit Court
is, by stipulation, solely between the two finance companies.
The Chancellor entered a decree upholding the claim of C.I.T.
and Auto Acceptance appeals.

Each of the transactions was handled between the dealer
and the finance companies in the same manner. The dealer
inquired by telephone whether or not the finance company
would purchase the dealer's interest in the contract and take
an assignment thereof, each finance company investigated the
credit of the customer, each notified the dealer on the day of
the inquiry that it would purchase the contract, each contract
was assigned by the dealer to the finance company therein
named, and each finance company sent its check for the agreed
purchase price of the contract ($1,995 in each instance) to
the dealer. The Chancellor found that the assignment to
C.I.T. was made on July 5th and the assignment to Auto
Acceptance was made on July 6th, 1955. His findings also
included the following: "I find as a fact that the conditional
contract of sale from Suburban Nash to Thomas was made
and that Suburban Nash assigned the contract to C.I.T. be-
fore the second contract of July 6th was executed and as-
signed to A.A.C. I further find that possession of the auto-
mobile was given to and taken by Thomas at the time of the
first contract and before the second alleged contract was as-

signed, and that Thomas had notice of the assignment to C.I.T."

There were some differences between the two contracts, but they do not appear to be of great significance. The C.I.T. contract was on that company's form and expressly stated that the contract was assigned by the dealer; the Auto Acceptance contract was on a general, printed form. This form, as filled in, stated that the contract would be assigned to Auto Acceptance. The name of the assignee was left blank on the printed form and was filled in apparently by a rubber stamp. Whether this name was inserted before or after the second contract was signed does not appear. Other differences were in: the collision coverage and total cost of insurance, which was considerably higher under the Auto Acceptance contract; the finance charges, C.I.T.'s being slightly higher; recording charges—$2.00 under the Auto Acceptance contract, none under C.I.T.'s; total charges and monthly instalments (30 in each instance)—$2587.50 and $86.25 for Auto Acceptance, and $2475.00 and $82.50 for C.I.T.; and signatures, there being an additional signature of one Grace Thomas on the Auto Acceptance contract, the reason for which is not explained.

Neither Mohr, a salesman for Suburban Nash who sold the car to Thomas, nor Thomas was called as a witness; but a printed form of document, entitled "Purchase Agreement", dated July 5, 1955, signed only by Mohr was put in evidence as a joint exhibit by the two finance companies. Its terms are in accord with those shown on both conditional contracts of sale as to the purchaser, seller and balance due. This form also contains a provision on its face stating that the customer was to pay Suburban Nash $55.00 per month and that Suburban Nash was to advance the difference in monthly payments to C.I.T., "free of any interest to purchaser." On the reverse of this form, there is a further statement, dated July 18, 1955, and signed only by Mohr, to the effect that Thomas was to have the option to pay Suburban Nash $55.00 a month for 36 months and that a clear title would then be delivered to the purchaser.

Suburban Nash is the same dealer whose fraud was in-

volved in *Mohr v. Sands,* 213 Md. 206, 131 A. 2d 732; and the present case is the second to reach this Court involving the consequences of Suburban Nash's fraudulent actions as between Auto Acceptance and C.I.T., each of which dealt with Suburban Nash on the basis of trust in the dealer's honesty. In this case as in *Mohr v. Sands,* an original title and a duplicate title to the car in question were obtained from the Department of Motor Vehicles. The duplicate was obtained upon an application apparently signed and acknowledged by Thomas which stated that the original had been lost. Neither title, according to the records of the Department, showed any lien. The original title was delivered to Auto Acceptance; the duplicate was delivered to C.I.T. Each document when so delivered showed a lien in favor of the finance company involved, in exactly the correct amount in the case of C.I.T. and with an error of a few cents in the case of Auto Acceptance. Each of these documents showed the date of the lien erroneously as August 6, 1955. The lien notations were put on by a pinpoint typewriter, but were not put on by the Department of Motor Vehicles.

There is no doubt, we think, that Thomas was aware of the fact that C.I.T. was the holder of a contract of conditional sale on his car. C.I.T. sent him its usual forms, including a certificate of insurance and a book of coupons to be used in making payments. Thomas presented and collected a small claim under the insurance policy effected by C.I.T. and payments to C.I.T. on account of his contract were accompanied by coupons issued to him. It also appears that Thomas made his payments to Suburban Nash. Despite the scanty testimony, it also seems probable that Suburban Nash made payments to both finance companies under the Thomas contracts until about the time of its collapse.

The Chancellor held that Section 2 of Article 8 relating to assignments of accounts receivable or contracts with or without notification to the debtor of the assignment, was controlling and that Section 74 of Article 21 of the Code (1951) relating to the recording of contracts of conditional sale was not applicable. He also referred to Section 43 of Article 83 of the Code (1951) and to *Mohr v. Sands, supra,* in which

that Section was held controlling where there had been no actual transfer of possession from the automobile dealer to the ostensible purchaser under a conditional contract of sale, and Section 74 of Article 21 was consequently held not applicable. However, in the instant case, there was an actual transfer of possession to the purchaser.

We do not agree with the view that Section 2 of Article 8 is controlling. That statute was passed in 1943, and was apparently inspired by the decision of the Supreme Court on March 8, 1943, in *Corn Exchange National Bk. & Tr. Co. v. Klauder*, 318 U. S. 434 (generally referred to as "the *Klauder* case"). See *Maryland Coop. Milk Producers, Inc. v. Bell*, 206 Md. 168, 176-177, 110 A. 2d 661; *Arnold, The 1950 Amendment to the Preference Section of the Bankruptcy Act and Maryland Law*, 14 Md. Law Rev. 311 (1954).[1] The *Klauder* case dealt with accounts receivable financing under the non-notification plan and Section 60 of the Bankruptcy Act, as amended in 1938. That statute made it possible for the trustee in bankruptcy to attack successfully certain transfers as preferential which were made within four months of bankruptcy. Under the 1938 amendment the time of transfer was deemed to be at the moment when no bona fide purchaser could acquire rights superior to those of the transferee. Where, as in Maryland,[2] notification to the debtor of the assignment of the account was necessary in order to perfect the assignee's title, an assignee of accounts receivable operating upon and adhering to the non-notification plan would never perfect his claim prior to the bankruptcy of the assignor. The test under the 1938 amendment was that of a hypothetical bona fide purchaser, and it made no difference with regard to the trustee's right to attack the assignment whether there was or was not an actual bona fide purchaser.[3]

1. See also *Koessler, Assignment of Accounts Receivable*, 33 Calif. Law Rev. 40 (1945), and *New Legislation Affecting Non-Notification Financing of Accounts Receivable*, 44 Mich. Law Rev. 563 (1946).

2. *Lambert v. Morgan*, 110 Md. 1, 72 A. 407.

3. The 1938 amendment to Section 60 of the Bankruptcy Act was amended on March 18, 1950, c. 70, § 1, 64 Stat. 24, and a correspond-

So far as here material, Section 2 of Article 8 provides as follows:

> "2. All written assignments, and all written assignments in the nature of a pledge, of accounts receivable and amounts due or to become due on open accounts or contracts, except in cases where notice to the debtor of such assignment is specifically required by any policy of insurance or a statute then in effect, shall be valid and legal and shall pass the title of such accounts receivable and amounts due or to become due on open accounts or contracts to the assignee thereof, and shall take effect according to the terms of the assignment, without the necessity of notice to the debtor, and the transfer of the title shall take effect and be valid and enforceable against all persons as of the date thereof; * * *."

Then follows a proviso protecting a debtor who pays to the assignor without notice of the assignment.

Section 2 of Article 8 makes no specific reference to contracts of conditional sale apart from contracts generally. It does speak of "accounts receivable" and of "amounts due or to become due on open accounts or contracts." However, neither the title of the statute (Acts of 1943, Ch. 728) nor its text manifests any intention to repeal Section 74 of Article 21 or any other statute. Repeals by implication are not favored. See *Kirkwood v. Provident Savings Bank,* 205 Md. 48, 106 A. 2d 103, and cases therein cited. We find no necessary inconsistency between Section 2 of Article 8 and Section 74 of Article 21 of the 1951 Code, and it is our view that Section 2 of Article 8 was not intended to have any bearing upon the recording statute relating to contracts of conditional sale. We think that Section 2 of Article 8 does apply to the assignment of amounts to become due under contracts of conditional sale, but it deals with the assignment of such contracts and it does

---

ing amendment of Sec. 70(c) was included in the amendatory Act. The so-called "lien creditor test" was substituted for the hypothetical bona fide purchaser test as to transfers of property other than real property.

not purport to validate such a contract itself as against any person as to whom the recording statute says it shall be void until recorded. A holding that Section 2 of Article 8 affords full protection to the assignees of unrecorded conditional contracts of sale would mean, as a practical matter (except, of course, in cases of actual notice or fraud, bad faith or the like), that such contracts need never be recorded, if they are assigned. Such a holding would mean that the enactment of Section 2 of Article 8 in large measure accomplished a repeal by implication of Section 74 of Article 21—a construction which we should not consider warranted.

Section 74 of Article 21 provides (so far as here material) as follows:

> "74. Every * * * contract for the sale of goods and chattels * * * wherein the title thereto, or a lien thereon, is reserved until the same be paid in whole or in part, or the transfer of title is made to depend upon any condition therein expressed and possession is to be delivered to the vendee, shall in respect to such reservation and condition, be void as to subsequent purchasers, mortgagees, incumbrancers, * * * until such * * * contract be in writing, signed by the vendee and be recorded * * * in the Clerk's office of the Superior Court of Baltimore City, or in the Clerk's office of the Circuit Courts of the various counties, as the case may be, * * *. Such recording shall be sufficient to give actual or constructive notice to such parties when a memorandum of the paper writing signed by the vendee or vendees, setting forth the date thereof, the amount due thereon, when and how payable and a brief description of the goods and chattels therein mentioned shall have been recorded with the clerk aforesaid, * * *."

The history of this Section and review of the cases in which it was involved and of the law prior to its enactment are to be found in Judge Markell's opinion in *Tatelbaum v. National Store Fixture Sales Co., Inc.,* 196 Md. 599, 78 A. 2d 228, and in Judge Delaplaine's opinion in *Tatelbaum v. Pantex Mfg.*

*Corp.*, 204 Md. 360, 104 A. 2d 813. This Section was twice repealed and re-enacted with amendments (by Ch. 430 of the Acts of 1949 and by Ch. 577 of the Acts of 1951) since the enactment of Section 2 of Article 8 in 1943, and no change has been made in the latter statute. If there were any conflict between the two statutes (and we do not think there is), Section 74 of Article 21 would prevail by reason of its being more recent in time. *Leitch v. Gaither,* 151 Md. 167, 134 A. 317; *McDonagh v. Matthews-Howard Co.,* 160 Md. 264, 153 A. 47.

We think that the holder of a contract of conditional sale is an "incumbrancer" within the meaning of Section 74 of Article 21, as amended by Ch. 430 of the Acts of 1949, when an enumeration of the classes of persons protected by the statute was substituted for the general term "third persons without notice." This statute does not define the term, but others that are *in pari materia* contain definitions and other provisions which seem persuasive, even though the definitions mentioned below are expressed as being applicable under or for the purposes of a particular article or sub-title of an article.

Thus, the Motor Vehicle Law, Article 66½ of the Code (1951), for the purposes of that Article, defines the term "owner" as including any "person, firm, association or corporation owning a vehicle or having the exclusive use thereof under contract of purchase, lease, hiring or rental thereof, or otherwise." Section 23 (a) of that Article requires the owner of a motor vehicle to make application for the registration thereof and for a certificate of title for such vehicle which must contain "(3) A statement of the applicant's title to and of all liens or encumbrances upon said vehicle * * *." Section 27 requires that the certificate of title contain "a statement * * * of all liens and encumbrances upon the vehicle therein described and whether possession is held by the owner under a lease, contract of conditional sale, or other like agreement. * * *"

In *C. I. T. Corporation v. Guy,* 170 Va. 16, 195 S. E. 659, a contract of conditional sale was held to be an encumbrance within the meaning of the Virginia Motor Vehicle Code,

pertinent provisions of which were very similar to Secs. 23(a) and 27 of the Maryland Motor Vehicle Law just cited.[4]  (See Acts of 1932, Ch. 342, and Acts of 1934, Ch. 265, Secs. 14(b) and 17(e), respectively, of the Virginia Motor Vehicle Code, as thereby amended.)

The Maryland Retail Instalment Sales Act (Secs. 116-140, inclusive, of Article 83 of the Code (1951)) by Section 139 (b) defines an "instalment sale agreement" as meaning in this sub-title "any contract for the retail sale of goods, * * * under which * * * (2) the seller has retained a security interest in the goods sold * * *; and shall include any conditional sale contract * * *." Subsection (o) of Sec. 139 states that:

> "(o) 'Security interest' means any property right in goods which are the subject of an instalment sale agreement taken or retained to secure performance of any obligation of the buyer under the agreement, * * * and the term shall include any reservation of title to such goods whether or not expressed to be · absolute, whenever such title is in substance retained for security only, any lien or encumbrance against such goods, and any interest of a mortgagee of such goods."

The Retail Instalment Sales Act is applicable to conditional contracts of sale covering motor vehicles where the cash price is $2,000 or less; and insofar as finance charges and insurance costs are concerned, is now applicable to such contracts without regard to the cash price.  (Acts of 1954, Ch. 80, adding Sec. 119A to Article 83 of the 1951 Code.)

---

4. *C. I. T. Corporation v. Guy, supra,* also held that § 5197 of the Virginia Code of 1919, requiring recordation in that state of chattel mortgages, deeds of trust and other encumbrances on personal property executed in another state covering property then in the other state, but later removed into Virginia, did not apply to contracts of conditional sale. This holding is an interpretation of Virginia statutory law. It seems to be based mainly upon the history of § 5197, and to some extent upon other factors of local, rather than general, applicability.

In *Tatelbaum v. National Store Fixture Sales Co., Inc.,* *supra,* Judge Markell said: "A conditional sale contract, like a mortgage or a pledge, is intended to furnish security in case of default." (196 Md. at 608.) Radin's Law Dictionary defines "encumbrance" (to which reference is made under the spelling "incumbrance"), as "Any burden or charge or lien resting on property, usually real property, which limits its use in the hands of the owner or may require a claim to be satisfied out of it. A warranty deed to property carries with it a covenant that there are no encumbrances not specified in the deed." In *Arnd v. Lerch,* 162 Md. 318, at 322, 159 A. 587, it was said that "the word 'incumbrance' has been held to include leases and ground rents." In that case the question was whether or not the sellers of certain real estate alleged to be subject to two one-cent ground rents had a merchantable title. This Court held that the ground rents were no longer in existence, and hence the title was merchantable. If such a legal title as that reserved under a one-cent ground rent constitutes an incumbrance, it would seem clear that a reservation of legal title for security purposes under a contract of conditional sale also constitutes an incumbrance. The very use of the term "incumbrancers" in Section 74 of Article 21 dealing with conditional sales of personal property, of course, precludes the idea (to be found in some older definitions of "incumbrance") that the term is limited in its application to interests in real property.

We believe that our holding that a conditional contract of sale does constitute an incumbrance within the meaning of Section 74 of Article 21 of the Code (1951) is in accord with general business understanding and with established practice with regard to noting such contracts on certificates of title to motor vehicles as liens or encumbrances and showing how the applicant holds possession of the vehicle. (It should, of course, be noted that under Maryland statutes the Department of Motor Vehicles is not a record office for liens on motor vehicles. A statement to this effect appears on certificates of title which it issues.)

The difficult question in this case is whether the second purported contract of conditional sale (that assigned to Auto

Acceptance) should be treated as what it purports to be and hence that it constitutes an incumbrance against which the earlier contract assigned to C.I.T. must be considered void. The answer depends not so much upon what rights, if any, the original conditional seller, in the absence of the recording statute, could lawfully retain or could assign, as upon the practical effect of the recording statute.

As Judge Markell pointed out in *Tatelbaum v. National Store Fixture Sales Co., Inc., supra* (196 Md. at 604-605): "In the absence of recording laws conditional sale contracts were generally held valid, not only between the parties but also against purchasers or creditors, * * * [i]n Maryland, however, they were held invalid against *bona fide* purchasers for value without notice, * * * but valid against creditors or receivers or assignees for the benefit of creditors, [and] [w]hether this rule as to purchasers was changed by the Uniform Sales Act, (Acts of 1910, ch. 346; * * *), this court never had occasion to decide, as the common law and the Sales Act were modified by the recording act of 1916, c. 355." This is the original statute from which Section 74 of Article 21 of the 1951 Code is derived. Judge Markell went on to say (196 Md. at 605-606): "In most states recording laws effect a sort of race of diligence in which holders of instruments recorded late and purchasers and lien creditors rank in order of time of recording or acquiring a lien by judicial proceedings. In Maryland the recording laws early proceeded on a different principle, viz., of protecting purchasers and creditors 'who may trust such party after the date of the said deed' * * * or 'creditors who have become so before the recording of such deed or conveyance, and without notice of the existence thereof' * * *. By the Act of 1949 the conditional sale act of 1916 seems to have been so changed as to follow the plan of recording laws in other states and to depart from the peculiar principle of Maryland recording laws. Until 1949 the conditional sale act of 1916 followed the Maryland principle; 'third parties' included creditors who 'trusted' the conditional vendee after delivery of the chattels and before recording of the contract: *Thomas Roberts & Co. v. Robinson, supra* [141 Md. 37, 118 A. 198];

*Gunby v. Mack International Motor Truck Co., supra* [156 Md. 19, 142 A. 596]; *Beckwith Machine Co. v. Matthews, supra* [190 Md. 182, 57 A. 2d 796]."

In the next paragraph of the *National Store Fixture Sales Co., Inc.* case, Judge Markell said (196 Md. 606): "Since the *purpose of recording is to protect against secret liens created by retention of title after delivery of possession,* the requirement of recording is not applicable before delivery of the goods." (Italics supplied.) The importance of possession was again recognized in connection with the recording of contracts of conditional sale in *Mohr v. Sands, supra.*

At the time of the execution of the second contract of conditional sale, the purchaser did have possession under the first, which was not recorded then nor was it recorded at the time when Auto Acceptance paid Suburban Nash for the contract, or until long thereafter. We have here a problem somewhat similar to that referred to in *Tatelbaum v. National Store Fixture Sales Co., Inc., supra,* as to whether there could be two present contracts of sale between the same buyer and the same seller covering the same property. In that case it was assumed that there could not be, but it was pointed out that the second contract only changed the terms of payment under the first. (196 Md. at 608.) In the instant case, on the *concessum* of the absence of any fraud on the part of the purchaser, it must be supposed that he thought that the second contract was either an amendment of the old in relatively minor respects or that it was a complete substitute for it. If the name of Auto Acceptance appeared on the second contract when Thomas signed it, the latter might seem a more probable inference; if it did not, the blank in the clause stating that "this contract will be assigned to ............ and all payments must be made to them at that office" would seem to give Suburban Nash the right to assign the contract to any finance company it might select. (The C.I.T. form called for payment at its office. The purchaser did not in fact comply with the terms of either contract as to the place of payment or the amount of the instalments.)

The purchaser did have possession of the automobile when he did execute a second contract of conditional sale covering

it. We cannot tell from the record what was said to him to induce the execution of the second contract. (It might possibly have been that he was told that the finance company would not handle the deal unless the purchaser's wife also signed the contract, and that he was given a new form for both to sign. It does not even appear whether the co-signer was his wife.) The record does not inform us whether the purchaser signed the second contract in the belief that it amended the first or superseded the first, or whether he thought C.I.T. was to do the financing or that Auto Acceptance was to do it, or whether (if the name of the prospective assignee was left blank) he was indifferent to what finance company handled the transaction, and authorized the dealer to fill in the name of any company it might choose and to assign the contract to that company.

Suburban Nash, the dealer, could certainly not have enforced the second contract against Thomas, the purchaser; but does this mean that the assignee could not do so?

The assignment of contracts of conditional sale by automobile finance companies is a widespread practice and a matter of common knowledge. Though the finance company is not an original party to either of the contracts here involved, certainly there is explicit notice under the first contract that C.I.T. is the assignee and under the second that some finance company (whether C.I.T., Auto Acceptance or some other company) is to be the assignee.

The secret lien which the recording statute invalidates as against subsequent "incumbrancers" is not validated against them merely by being assigned to a third party. As we have already indicated, if such a result followed from an assignment, Section 2 of Article 8 of the 1951 Code would, as a practical matter, have rendered nugatory Section 74 of Article 21 of that Code.

If the purchaser had fraudulently transferred to a *bona fide* purchaser, mortgagee or incumbrancer the property covered by the unrecorded contract of conditional sale, or an interest in such property, quite clearly the rights of C.I.T. as the assignee of the unrecorded contract would have been cut off as against such a purchaser, mortgagee or incumbrancer.

Here the purchaser has executed an instrument which purports to effect a transfer of an interest in the property in his possession. The fact that he has done so innocently, and probably as a result of fraud practised upon him, does not, we think, give his act less efficacy from the standpoint of the operation of the recording statute than if he had himself acted fraudulently. Nor does the fact that his act would have had no adverse effect upon the first assignee but for the fraud of the assignor call for a different result. Neither does the failure of the second assignee to examine the conditional sales records alter the result. If C.I.T. had recorded its contract in time, Auto Acceptance would have been bound whether it looked at the records or not. *Per contra,* and under the explicit language of the recording statute, the reservation of title under the first contract of conditional sale is void as against subsequent incumbrancers until recorded. The critical time under the rule of *Tatelbaum v. National Store Fixture Sales Co., Inc., supra,* is the time of delivery of the automobile; and even if it were when Auto Acceptance paid for the contract, the result would still be the same in this case, for there had been no recording then.

The statute affords a means of protection to those who will avail themselves of it by prompt action. *Roberts & Co. v. Robinson,* 141 Md. 37, 118 A. 198; *Friedman v. Sterling Refrigerator Co.,* 104 F. 2d 837 (4th Cir.) Neither finance company evinced the slightest intention of recording its contract until Suburban Nash's financial difficulties became known, and neither advanced any money on the faith of a contract of conditional sale covering Thomas' automobile after either contract was recorded. Since the statute operates as a bar only in favor of subsequent incumbrancers, the fact that each contract was recorded long after both finance companies had purchased the contracts seems of no controlling effect. Our statute fixes no time for recording and makes no provision for relation back to the date of the agreement.[5]

---

5. But see Section 60(a) (7) (I) of the Bankruptcy Act, as amended in 1950, providing that where a state law does not specify a time limit for recording, the transfer will be treated as a preference under federal law if not recorded within twenty-one days.

Such problems are considered by Mr. Tiffany in his work on *Real Property* (3rd Ed.), § 1272. We, therefore, find it unnecessary to consider whether or not the evidence was sufficient to show that Auto Acceptance had knowledge of C.I.T.'s claim when it recorded its contract somewhat more than six months later.

The appellee cited at the argument the case of *Abels v. National Bond & Investment Co.* (Ind. App.), 13 N. E. 2d 903 (1938). The statutes there involved (which are not set forth in the opinion) appear to be entirely different from our Section 74 of Article 21, and we therefore find the case of no help in the solution of the problem before us.

In accordance with these views the decree of the Circuit Court is reversed and the case remanded for the passage of a decree in conformity with this opinion.

> *Decree reversed and case remanded for the passage of a decree in conformity with this opinion, costs to be paid by the appellee.*

HAMMOND, J., filed the following dissenting opinion, in which HENDERSON, J., concurred.

To me the statute that deals with the recording of conditional sales contracts is not applicable, or certainly not controlling, in this case for two simple and fundamental reasons.

First, the statute's design is to protect only those of the classes of third persons expressly therein designated who may subsequently deal with the chattel sold in reliance on the possession of the buyer, without notice that it has not been paid for, and who would be hurt save for the statute. Automobile Acceptance, the second finance company, did not rely, and could not possibly have relied, actually, presumptively, or theoretically, on Thomas' possession of the automobile as indicating that he had title to it and was free to sell or encumber it. Automobile Acceptance, without question, acted in the belief that Suburban Nash, when the contract was signed, had both title and possession.

Second, a conditional vendor is an owner, not a lienor.

The statute protects only purchasers from the conditional vendee and lienors whose liens were created by virtue of, or flow from, the ostensible ownership of the conditional vendee indicated by his possession of the chattel. Automobile Acceptance bought Suburban Nash's legal title to the car that Thomas had agreed to buy from Suburban Nash, plus the right to receive the balance of the purchase price. It became a creditor of Thomas but not a creditor with a lien. "A person could hardly be said to have a lien on property to which he had the title." *Westinghouse v. State Tax Commission*, 206 Md. 392, 402.

Consideration of the theories as to conditional sales generally held throughout the country and of the Maryland view, both ante and post the 1949 amendment to the recording act, may serve to put the case in proper perspective. In the absence of a statute, generally it was held that a seller's reservation of title for security was good not only between the parties but also against purchasers from and creditors of the vendee. *Tatelbaum v. National Store Fixture Sales Co.*, 196 Md. 599, 604. In Maryland it was good except as against a bona fide purchaser from the conditional vendee without notice of the title of the conditional vendor. *Praeger v. Implement Co.*, 122 Md. 303, 308; *Mohr v. Sands*, 213 Md. 206, 211. Maryland passed its first recording act as to conditional sales agreements in 1916. Unless recorded, the seller's reservation of title was ineffective against "third persons without notice." Third persons were construed to mean all who trusted the conditional vendee after he had obtained possession, whose financial position would be worsened if the reservation of title was effective, including general creditors. "If it had been intended to protect only purchasers and lienors, that purpose would have been expressed." *Roberts & Co. v. Robinson*, 141 Md. 37, 43. This statutory protection for all who actually or presumptively relied on the vendee's possession was far more liberal than the protection given by the Uniform Conditional Sales Act or the laws of most of the States. The Uniform Act protects "any purchaser from or creditor of the buyer, who, without notice" * * * purchases the goods, or acquires a lien on them by attachment or levy. Generally only

purchasers from, or judicial lien creditors of, the conditional vendee take precedence over the reserved title of the vendor under an unrecorded contract. In 1949 at the instance of the large credit companies who finance most of the conditional sales, the Maryland Legislature expressed the purpose mentioned in the *Roberts* case to protect only purchasers and lienors for it eliminated the words "third persons without notice" and in their place put "subsequent purchasers, mortgagees, incumbrancers, landlords with liens, pledgees, receivers, and creditors who acquired a lien by judicial proceedings on such goods and chattels * * *." As Judge Markell said for the Court in the *National Store Fixture Sales* case (at page 605 of 196 Md.): "By the Act of 1949 the conditional sale act of 1916 seems to have been so changed as to follow the plan of recording laws in other states and to depart from the peculiar principle of Maryland recording laws."

It seems clear that at least since 1949 Maryland agrees with most jurisdictions that the purpose of the conditional sales recording act—now Code, 1957, Art. 21, Sec. 66—is to protect against non-recorded contracts only those designated in the statute who may subsequently deal with the buyer as to the chattel in his possession in reliance on that possession, without notice that the chattel has not been paid for and is not his to dispose of. *Tatelbaum v. National Store Fixture Sales Co.*, 196 Md. 599, 606; *Mohr v. Sands*, 213 Md. 206, 211, 213, 214, both *supra*. In the *Mohr* case, Chief Judge Brune said for the Court: "If we approach the matter from the point of view of the purpose of the recording statutes involved, we find that they serve primarily to give protection against the consequences of false or misleading appearances of ownership based upon the possession of chattels"; and later he said that the fact that the recording must be at the place of the residence of the buyer, and the fact that both the statute and business custom contemplate actual delivery to the vendee, "* * * emphasize the view that the statute is concerned primarily with appearances based upon the vendee's possession of the chattel, and with the protection of the vendor's rights, notwithstanding the transfer of possession to the vendee, and

*not with the transfer or curtailment of any rights of owner-
ship in the conditional vendor."* (Emphasis supplied.)

It must be plain that a finance company when it buys the
reserved title of a dealer to a car he has just delivered to a
customer, is under no illusions whatever as to what has
happened, both actually and legally. It knows the customer
did not have possession when he signed the contract. It
knows that at that time the dealer had both possession and
title and that it continues to have title. It knows the dealer
did not rely on the customer's possession of, or apparent right
to pledge or encumber his own property to secure a debt.
As assignee of the dealer's title and rights, with this knowl-
edge, its standing is that of the dealer and no more. *Burrier
v. Cunningham Piano Co.,* 135 Md. 135, 142.

The initial parties to a conditional sale must be a real seller
and a real buyer because such a sale must always have its
origin in an actual bona fide purchase and sale in the eco-
nomic sense. It is never available to a borrower in possession
and a money lender, even though the latter go through the
form of taking title and possession of the chattel he purports
to sell. *Chattel Security,* 57 Yale Law Journal 517, at 541-
542; *Hughbanks v. Gourley* (Wash.), 120 P. 2d 523. In
the case before us the finance company was interested in
Thomas' credit, not his possession, for it knew his very re-
cently acquired possession did not indicate legal ownership
or title or the right to sell or encumber the car. The ma-
jority opinion recognizes this when it says that after Suburban
Nash inquired by telephone whether the finance companies
would purchase the contract, "each finance company investi-
gated the *credit* of the customer * * *." (Emphasis sup-
plied.) The conditional contract of sale itself, which the
finance company draws and buys, forbids the vendee to sell
or encumber the car.

In *Mohr v. Sands, supra,* the lack of any possible reliance
on the possession of the conditional vendee was held to make
the statute inapplicable. In *Gunby v. Motor Truck Corp.,*
156 Md. 19, 25-26, it was held under the liberal 1916 act that
creditors who gave credit to the conditional vendee before the

contract, and obtained judgment before it was recorded, were not protected. The Court said: "If credit was not given in reliance upon ownership of the debtor in the property in controversy, the title of plaintiff was not divested * * *." Since the elements of belief in, a right to believe in, and trust on the strength of, ostensible title in the buyer, evidenced by possession, are all entirely lacking in the instant case, the statute no more applies than it did in *Mohr* and *Gunby*. If the statute does not apply, it must follow that Automobile Acceptance got nothing. Code, 1951, Art. 8, Sec. 2 (relied on by Judge Oppenheimer below, and found by the majority not to be applicable); *Lynn Morris Plan Co. v. Gordon* (Mass.), 146 N. E. 685; *Colella v. Essex County Acceptance Corp.* (Mass.), 192 N. E. 622; *Commerce Union Bank v. Overall* (Tenn. App.), 274 S. W. 2d 15; *Commercial Credit Co. v. Neel* (Fla.), 107 So. 639; *Federal Credit Co. v. Scoggins* (Miss.), 130 So. 153; *New Britain Real Estate and Title Co. v. Hartford Acceptance Corp.* (Conn.), 153 A. 658. As the majority opinion concedes (and Judge Markell in *National Store Fixture Sales Co.* assumed at page 608 of 196 Md.), there cannot be a second valid agreement of sale for the same chattel between the same parties, and Suburban Nash could not have enforced the second agreement against Thomas. Neither could have Automobile Acceptance since it derived whatever title and rights it got from Suburban Nash and not from Thomas. When Suburban Nash made the first sale to Thomas and assigned the contract to C.I.T., it not only assigned its contract right to collect the purchase price, it also transferred its title to and property in the automobile, and had nothing left to sell to Thomas or to Automobile Acceptance on the next day. *Burrier v. Cunningham Piano Co.*, 135 Md. 135, 142. In the *Lynn Morris Plan* case, cited above, Chief Justice Rugg said for the Supreme Judicial Court of Massachusetts that after a conditional vendor "transferred his agreement for sale and indorsed the note to the plaintiff, he had no title or interest whatsoever in the automobile * * * and no evidence of title or interest." Despite this, after the conditional buyer returned the automobile, the original seller sold it to another purchaser. It was held that the title of

the original assignee was not disturbed by the second sale. The Court said: "The seller stood no better than a stranger to the transaction. The defendant acquired no greater title than his vendor was able to convey."

The second reason why the recording statute is not applicable is because, under it, a conditional vendor is not a lienor. It is held generally, as it is, and has always been, in Maryland, that a conditional vendor does not hold a lien or encumbrance on the chattel, but that he has title to and ownership of it, with the right to regain possession for condition broken. The conditional vendee has the right to possession as long as he fulfills his obligations and the right to obtain title by their complete fulfillment. The Uniform Conditional Sales Act is so construed. *In re Lake's Laundry*, 79 F. 2d 326 (2nd Cir. 1935), cert. den. 296 U. S. 622. There it was held that the chattel was not to be reckoned as the property or among the assets of the conditional buyer and that the seller did not have a lien on the chattel but was the title holder and owner in law. In *Stern Co. v. Rosenberg*, 89 F. 2d 843 (D. C. Cir. 1937), the vendee was held to be a bailee. The interest of a conditional vendor is not a pledge interest, *Maxwell v. Tufts* (N. M.), 45 P. 979; *Winton Motor Carriage Co. v. Broadway Automobile Co.* (Wash.), 118 P. 817; and is not a lien in the nature of a chattel mortgage, *In re Lake's Laundry, supra.* In Maryland the reasoning and the conclusions of the *Lake* case have been accepted and, applied as the law, both before and after the passage of the recording acts. *Arnold, Conditional Sales of Chattels in Maryland,* 1 Maryland Law Review 187, 188; *Praeger v. Implement Co.*, 122 Md. 303, *supra; Burrier v. Cunningham Piano Co.*, *supra; Tatelbaum v. National Store Fixture Sales Co.*, 196 Md. 599, *supra; Mohr v. Sands, supra.*

The very statute involved recognizes and applies the difference between title and a lien. It says: "Every * * * contract for the sale of goods and chattels * * * wherein the *title* thereto, or a *lien* thereon, is reserved until the same be paid * * * shall in respect to such reservation * * * be void as to subsequent purchasers, mortgagees, incumbrancers * * *." (Emphasis supplied.) So, too, does the Retail In-

stallment Sales Act (although, as the Court's opinion recognizes, its definition is applicable only to it), when in Code, 1957, Art. 83, Sec. 152 (o), it says that the term security interest "* * * shall include any *reservation of title* * * * whenever such title is *in substance retained for security only,* any *lien* or *encumbrance* against such goods, and any *interest of a mortgagee* of such goods." (Emphasis supplied.) The inference that must be drawn from the quoted language, as I see it, is that a reservation of title for security is not considered to be encompassed in terms or in concept by a "lien" or an "encumbrance" or the "interest of a mortgagee." That Code, 1957, Art. 66½, for the self-limited purposes of licensing and regulating motor vehicles only, now defines, as it long has, a conditional vendee as an owner does not indicate the contrary. The very necessity of such a definition shows that except for it, the vendee would not be an owner, and the security interest of the vendor would not be treated as a lien for automobile title certificate purposes. In rejecting a similar limited definition as without significance as to the legal status of a conditional vendee, the Indiana Court in *Champa v. Consolidated Finance Corp.*, 110 N. E. 2d 289, 292, said: "The word 'owner' does not ordinarily include a conditional vendee. If it did, it would have been unnecessary for the legislature to define a conditional vendee as an 'owner' in the enactments above-mentioned. Recognition of the fact that a conditional vendee is not an 'owner' is found in § 2 of the Uniform Conditional Sales Act, * * * which provides that the buyer 'shall * * * have the right to acquire the property in the goods on the performance of the conditions of the contract.'."

Yet the majority says that one who reserves title can at the same time be both an owner and an incumbrancer. Such a construction and result seem to me to be in the teeth of all pertinent established principles and of the language and intent of the statute. If a conditional vendee sells the chattel to a third person or creates, or brings about or permits the creation of, a lien on the chattel in favor of a third person, and that third person does not know of his limited interest and rights, then and then only does the statute come into

play and transform the vendee into the holder of the legal title for the purpose of allowing its passage to the purchaser or supporting a lien. An automobile dealer who sells a car to a customer and retains title remains an owner, and when he sells his ownership to the finance company, it becomes the owner. *Burrier v. Cunningham Piano Co., supra.* Neither can be said to acquire a lien because a lien interest must pass from either an actual owner, or one the law makes an owner because reliance has been put on his possession, to the lienor. This was recognized, as we have noted before, in *Westinghouse v. State Tax Commission,* 206 Md. 392, 404. In *Roberts & Co. v. Robinson,* 141 Md. 37, 43, 49, the conditional contract reserved in the seller the title to the cans purchased and gave a lien on their contents when filled by the vendee with produce obtained from others. The Court said: "In regard to either of these purposes, and to both combined, the agreement is within the effect of the statute we have quoted." Again the Court noted that "With respect to the *contents* of the cans replevied in the present case, the plaintiffs' claim is not of a title reserved under a conditional sale, but of a lien on material bought from other persons."

That one cannot be an owner and lienor at the same time in respect to the same chattel is illustrated by the decisions that a conditional seller waives his reservation of title by seeking to enforce, or enforcing, a mechanics lien on chattels affixed to realty, or by obtaining a judicial lien after judgment for the purchase price. See 78 *C. J. S., Sales,* Sec. 588, page 333.

In the case of *C. I. T. Corp. v. Guy,* 195 S. E. 659, 662, the Virginia Supreme Court of Appeals in effect adopted a lower court decision that a conditional sale was not an encumbrance, saying that in *Osmond-Barringer Co. v. Hey,* 7 Va. Law Reg., N. S., 175: "Judge Crump was of opinion that a conditional sale was not an encumbrance and so did not fall under the ban of the statute. Chattel mortgages are encumbrances and to cover them is one of the reasons for its enactment. It is perfectly true that this decision of Judge Crump is not controlling authority, but it is the considered

opinion of a great judge, who afterwards became president of our Special Court of Appeals."

With more logic and reason than can be found to support the conclusion that a conditional vendor is an incumbrancer, it could have been argued that Automobile Acceptance was a subsequent purchaser. It bought legal title to the car and was its owner subject to Thomas' right to obtain title on paying the price. This argument, of course, immediately reveals what to me are the fatal weaknesses and flaws in the position of the majority. Automobile Acceptance was a subsequent purchaser without question but not from Thomas. It was a purchaser from Suburban Nash. The statute protects only purchasers from Thomas. *Mohr v. Sands,* cited before. So also the statute protects only against encumbrances created by or flowing from Thomas. Agreeing to buy a chattel from its owner and to pay for it, while at the same time acknowledging and agreeing that the chattel is to continue to belong to the owner-seller until paid for, cannot change the seller from an owner to the holder of a lien. Such a new purchaser has no ownership or title to encumber or pledge or mortgage, and the dealer and the finance company knew this. There was no ostensible ownership or title for them to have relied on or have been fooled by, such as would have caused the law to transform Thomas into an owner to avoid injustice.

Almost universally conditional sales agreements forbid the buyer to pledge, mortgage or encumber the chattel. The extensive general and long continued use of such provisions is made manifest by a discussion of the forbidding of encumbrances in *Goldenberg v. Finance & Credit Co.,* 150 Md. 298, and the many cases throughout the country cited in the annotation in 36 A. L. R. 2d 198, 222-224. Nevertheless, automobile buyers, and buyers of other chattels, flout such restrictive conditions and do encumber the chattels they possess and apparently can deal with as their own. It is this evil that the recording statutes are concerned with. In addition, in some States statutes have been passed making it a crime for a conditional vendee to sell or encumber the chattel with intent to defraud the vendor. Under such statutes it is a

necessary element of the crime that title be in the seller. 78 *C. J. S., Sales,* Sec. 648. Maryland has such a statute— Code, 1957, Art. 27, Sec. 214.

The term "incumbrancer" as used in the statute to me seems to have been intended to mean one whose lien came from the conditional buyer as an apparent and ostensible legal owner. It would seem to have been called for by, and to have contemplated, the kind of situation forbidden by the criminal statutes, and found in *Goldenberg* and similar cases. I do not see any of the elements of such a situation in the facts of the present case. I would affirm the decree below.

Judge Henderson has authorized me to say that he concurs in the views herein expressed.